## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | Chapter 7 |
| | : | |
| GEOFFREY CORNOG HORROCKS, Sr., | : | |
| | : | |
| Debtor. | : | Bky. No. 13-15161 |
| | : | |
| | : | |
| MARK PLEPIS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| GEOFFREY CORNOG HORROCKS, Sr., | : | |
| | : | |
| Defendant. | : | Adv. No. 13-0420 |
| | : | |

## O P I N I O N

BY:   JEAN K. FITZSIMON
      **United States Bankruptcy Judge**

## I.  INTRODUCTION

Plaintiff Mark Plepis ("Plepis") served as Operations Manager at Diversified Realty, Inc. ("Diversified"), a company owned in part by Debtor Geoffrey Cornog Horrocks, Sr. (the "Debtor" or "Horrocks"). Plepis also lent considerable sums of money to both Diversified and to another company at which the Debtor worked, Amrock Investments, LP ("Amrock") (together with Diversified, the "Companies").[1]

The Plaintiff filed this Adversary Proceeding, originally seeking to have the debts owed to him by the Companies declared nondischargeable in Horrocks' bankruptcy.

---

[1] Amrock is sometimes referred to in the exhibits as "Am-Rock." The parties refer to the company as "Amrock," which is what the Court will do.

However, Plepis ran into a problem. The debts were owed by the Companies and not by Horrocks directly. This problem has proved insurmountable.

The Plaintiff re-plead the Amended Complaint to add a count for piercing the corporate veil and insisted that the Companies were an alter-ego of the Debtor.[2] Plepis argued that the Debtor was, therefore, on the hook for the debts owed to him. A trial was held solely on this preliminary issue. For the reasons discussed below, the Court finds that the Plaintiff failed to present sufficient evidence that Amrock is the alter-ego of the Debtor; therefore, the corporate veil will not be pierced and relief will not be granted to the Plaintiff. As a result, no further trial or hearing is necessary.

## II.  PROCEDURAL HISTORY

This adversary proceeding was filed on August 1, 2013. For reasons stated on the record, the Court granted the Debtor's first two Motions to Dismiss. See doc. nos.11 and 20. After the Debtor again sought dismissal of the Second Amended Complaint (doc. no. 22, the "SAC"), the Court denied the requested relief and ordered the Debtor to file an answer. Doc. no. 30.

The SAC alleges three causes of action:[3] 1) that the Defendant is the alter-ego of the Companies and, therefore, that the corporate veil should be pierced in order to hold Horrocks liable for the debts owed to Plepis; 2) that any debt owed by the Debtor to the Plaintiff is nondischargeable pursuant to 11 U.S.C. §523(a)(2)(A); and 3) that any debt owed by the Debtor to the Plaintiff is nondischargeable pursuant to 11 U.S.C. §523(a)(2)(B).

---

[2] Although the Second Amended Complaint is not a model of clarity, Plepis made clear at the trial that he only sought to pierce the corporate veil with regard to Amrock. Transcript of trial at 212. Doc. no. 79. The evidence presented at trial, in fact, reiterated this.

[3] These Counts are interpreted and spelled out by the Court in the Speaking Order denying the third Motion to Dismiss. Doc. no. 30 at 7.

The Debtor's Answer (the "Answer") to the SAC included a counterclaim (the "Counterclaim") seeking a declaratory judgment that Counts I through XII of a Court of Common Pleas action by the Plaintiff in 2007 (the "State Law Action") be "discharged." Doc. no. 35 at 25-26.[4] The Plaintiff answered the Counterclaim on May 12, 2014, denying all relevant allegations. Doc. no. 36 (the "Counterclaim Answer"). Pursuant to the Court's scheduling order, the parties filed a joint pretrial statement on May 29, 2015. Doc. no. 51.[5]

On June 24, 2015, the Court both granted the Plaintiff's Motion in Limine to exclude testimony at the trial relating to the Debtor's unclean hands defense and denied the Debtor's Motion in limine to exclude certain documents relating to his financial condition. See doc. nos. 46, 48, 56, 62, 69, 70.[6]

Because the Court determined the issue of piercing the corporate veil to be a preliminary one - i.e., if the Plaintiff is not able to succeed on this cause of action, then the other aspects of the SAC are moot - the trial in this matter was bifurcated. A trial with regard only to the issue of

---

[4] The State Law Action is not attached as an exhibit nor described in either the SAC or the Answer. The original Complaint attached the State Law Action as an exhibit. Doc. no. 1, Ex. A. The State Law Action was filed in 2008 by Plepis in the Court of Common Pleas of Montgomery County against Geoffrey Horrocks, Kimberly Horrocks, and Edward Jones, and several of Mr. Horrocks' companies: Amrock Investments, LP, Diversified Realty, Inc., Diversified New Jersey Limited Partnership, Eastern Equities, Inc., Skippack Land Holdings, LLC, Telford Land Holdings, LLC, Trinity Land Holdings, LLC, Burlington Country Woods, LLC, Woolwich, LLC (collectively, the "Defendants") and alleged seven causes of action: 1) breach of contract (against Diversified Realty, Inc.); 2) breach of contract (against Amrock Investments, LP and Diversified Realty, Inc.); 3) breach of contract (against Amrock Investments and Diversified Realty, Inc.); 4) breach of contract (against Amrock Investments and Diversified Realty, Inc.); 5) breach of contract (against Amrock Investments and Diversified Realty, Inc.); 6) violation of RICO (against Geoffrey Horrocks and Edward Jones); 7) securities fraud (against Geoffrey Horrocks and Edward Jones); 8)Pennsylvania Uniform Fraudulent Transfer Act (against all Defendants); 9) alter-ego theory (against Geoffrey Horrocks); 10) Pennsylvania Uniform Fraudulent Transfer Act (against all Defendants); 11) unjust enrichment (against all Defendants); and 12) enterprise theory (against all Defendants).

[5] The document is actually entitled the "Amended Joint Pre-Trial Statement." The parties emailed an initial Joint Pretrial Statement to the Court's Law Clerk on April 13, 2015, but did not file it.

[6] Defendant's Motion to Compel was denied the same day. Doc. nos. 54, 63, 71.

the alter-ego/piercing the corporate veil was held on November 10, 2015 (closing arguments

were heard separately) with the understanding that if the Plaintiff prevailed, the trial would be

continued to a later date in order to determine the nondischargeability causes of action. However,

if the Plaintiff failed to meet his burden of proof with regard to piercing the corporate veil, then

there would be no need for further trial because the Debtor is not personally liable for the debts

of Amrock owed to Plepis.

Three witnesses testified at the November trial: the Debtor, Geoffrey Cornog Horrocks,

the Plaintiff, Mark Plepis, and Brian Good ("Good"), the accountant for the Companies. Counsel

for the parties made closing arguments on January 26, 2016.

The Plaintiff submitted a post-trial brief on January 4, 2016 (doc. no. 80, as edited by doc.

no. 85 on February 5, 2016, the "Plaintiff's Post-Trial Brief"),[7] as did the Debtor. Doc. no. 81.[8]

The Defendant filed a reply brief on February 22, 2016 (doc. no. 86, the "Debtor's Reply").


### III.  FINDINGS OF FACT

Upon consideration of the testimony and documentary evidence offered at trial, as well as

the pleadings, the Court makes the following findings of fact:


**The Debtor's Background in Business**

1. In 1991, Horrocks received his real estate license. Transcript of trial on November 10,

2015. Doc. No. 79 ("Tr. 1") at 128. After representing clients for a couple of years, in 1993 the

---

[7] Citations are to the amended brief. The Post-Trial Brief was amended following certain errors discovered with it at the closing argument.

[8] The Debtor's Post Trial Brief was mistakenly originally filed in the main bankruptcy case.

Debtor formed a partnership in Montgomery County with Jeff Clemens called the Clemrock Group. Id. at 128-129.

2. The Clemrock Group later became Clemrock Incorporated ("Clemrock, Inc.") in 1995. Tr.1 at 129. Clemrock, Inc. worked with distressed properties, and went into partnerships on residential and commercial developments with a local developer. Id.

3. The Debtor and Jeff Clemens financed the acquisition of the properties for Clemrock, Inc. by borrowing money. Tr.1 at 130.

4. During his time at Clemrock, Inc., Horrocks became involved in land development as well. Tr.1 at 130. By developing land, the Debtor and his partner strove to identify "property that would lend itself for something other than the use that it currently" maintained. Tr.1 at 131.

5. As part of this venture, the Debtor became involved in the logistics of land development in addition to the finances of it. Tr.1 at 131-135. The period from identification of desirable land until the time of township approval usually took about three years to complete. Tr.1 at 132. The developer usually does not realize a profit until after the approvals (by a zoning board). Tr.1 at 136.

6. In the late 1990's, the Debtor was involved in a number of land development projects in Montgomery County, including the Meadow Glen Development and Hillandale. Tr.1 at 136-137.

7. Around this time period (the late 1990's), Jeff Clemens and Horrocks separated professionally. Tr.1 at 138. Each executed a joint venture agreement with a new company, Eastern Equities. Tr.1 at 138.

8. In 2002 or 2003, Horrock's formed a company called Telford Land Holdings, LLC ("Telford") with a partner named Ed Jones. Tr.1 at 158, 171. Telford bought real estate and performed "other real estate activities." Id at 158.

-5-

9. Horrocks also formed an LLC called Trinity Land Holdings ("Trinity") with developers named Ed Jones and Tom Bonner. Tr.1 at 162. Trinity was responsible, *inter alia,* for selling parcels of land and retaining profits. Tr.1 at 217.

10. The Debtor formed Skippack Land Holdings, LLC ("Skippack") with Ed Jones and Tom Bonner for land development activities in Montgomery County. Tr.1 at 165. In 2007, Skippack lost approximately $300,000 in land sales. Tr.1 at 218.

11. Horrocks was the sole member of an entity called Burlington County Woods, LLC, which obtained financing, purchased and sold land in New Jersey. Tr.1 at 168.

**Background of the Companies**

***Diversified***

12. Diversified was a real estate investment firm which was in the business of, *inter alia*, locating and identifying land suitable for development. SAC at 2.

13. Horrocks was - at certain, but not all relevant times - the President, Secretary, Treasurer and a shareholder of Diversified. SAC at 2; Tr. 1 at 12, 146; Ex. D-11.

14. The Debtor was not the sole officer, director, or shareholder of Diversified. Ex. D-11. Kimberly Horrocks, the Debtor's wife, held shares in Diversified. Id.  A.T. Mathis[9] was, during certain time periods, an officer of Diversified. Ex. D-11.

15.  Diversified was a Nevada corporation and obtained a fictitious name in Pennsylvania in order to "buy, sell, lease, develop and otherwise deal in real estate." D-6 at 1; Tr.1 at 140; Exs. D-5 and D-6.

16. Diversified was the general partner of Amrock. Tr.1 at 255.

_____

[9] It is not clear who A.T. Mathis is or how he or she is related to the Debtor.

17. Diversified's "Resolution of the Board of Directors" permits the President of the Company, *inter alia*, to "make loans to employees or enter onto and execute any document representing debt or encumbrances or obligations of any type at his/her discretion and in his/her best judgment." Ex. D-11 at 5; Tr.1 at 52.

**Amrock**

18. In 1999, Amrock was formed as a limited partnership by Joe Amity (through his company Rabbit Ridge Enterprises) and Horrocks. Tr.1 at 137-138. Eastern Equities, one of the Debtor's land development companies, was involved in this venture of identifying properties and finding funding sources to back the projects. Id. at 138.

19. Amrock was a Nevada Corporation. Tr.1 at 139; Exs. D-1 through D-5.

20. Diversified was a general partner of Amrock. SAC at 2; Tr.1 at 140; Ex. D-1.

21. Horrocks was a limited partner of Amrock. SAC at 2; Tr.1 at 12; Ex.D-3. The other limited partners of Amrock were Rabbit Ridge Enterprises and Kimberly Horrocks. Tr.1 at 140; Ex. D-3.[10]

22. One of the purposes of Amrock was to fund Eastern Equities, one of the Debtor's land development companies. Tr.1 at 172. Amrock did not itself take title to properties. Id.

23. Pursuant to Amrock's Agreement of Limited Partnership, "[t]he management and control of the Partnership and its business shall be vested exclusively in the General Partners, who shall have all the powers . . . ." Ex. D3, §9.1.

24. Diversified was the only General Partner of Amrock and owned 1% of the Company. Ex. D-3.

---

[10] Horrocks and Kimberly Horrocks each owned 37% of Amrock and Rabbit Ridge Enterprises owned 25%. Ex. D-3.

25. Amrock's balance sheets for the years from 2002 through 2006 show that the company had liabilities that were greater than its assets and, consequently, a negative equity. Ex. D-12.

26. Amrock went through a "wind[ing] down" period in 2006 and 2007 and the business was essentially closed by 2007. Tr.1 at 195-196.

27. Pursuant to Amrock's Agreement of Limited Partnership, upon termination of the company, the assets or proceeds of the business were to be applied first "[t]o the payment and discharge of all Partnership debts and liabilities to Persons other than Partners or (former Partners). . . ." Ex. D-3, §13.3(a).

## The Debtor's Role at the Companies

28. From 2001 to 2007 (the "Relevant Time Period"), the Companies did not provide the sole source of the Debtor's income; Horrocks also received income from real estate sales and the sale of an (unspecified) real estate company. Tr.1 at 12-14.[11]

29. From 2001 to approximately 2004, the Debtor worked at least 60 hours per week at the Companies. Tr. 1 at 56,58. His specific duties were not made clear.

30. In addition to Diversified and Amrock, Horrocks was also a partner or member of Diversified New Jersey Realty Limited Partnership, Skippack Land Holdings, LLC, Telford Land Holdings, LLC, Woolrich, LLC, and Burlington Country Woods, LLC. SAC at 3. Horrocks was also Vice President of Eastern Equities, Inc. Id.

---

[11] The testimony at trial on this point, which was credible, contradicted the Debtor's earlier deposition testimony. Tr. 1 at 13. The Debtor testified that while he accurately testified at his deposition, he then (prior to the trial) acquired knowledge of additional residual income from real estate sales (and thus changes his testimony). Id.

**Loans from Amrock to the Debtor**

31. Between July 18, 2000 and September 16, 2008, Amrock made loans either to Horrocks or made payments for his benefit which totaled approximately $1,179,009 (the "Benefit Sum"). The Benefit Sum was made though a series of transactions over eight years (the "Loans"). See Exhibit P-24[12] (the "Reconciliation") at 1-61.[13]

32. The Loans consisted of over 100 separate transactions. Ex. P-24. Tr.1 at 36-37.

---

[12] Exhibit P-24 is a spreadsheet of Amrock's costs and expenses. It was created by the Debtor and provided to Plaintiff's counsel, who submitted it as an exhibit at trial. See Tr.1 at 11, 17-19. (Although the Debtor refers to the Reconciliation as containing the "Companies" information, this is not clear from the document, which is entitled simply "Amrock Investments, L.P.") Tr.1 at 17.

Debtor's counsel objected at the trial to the submission of the Reconciliation, but the Debtor is incorrect in his assertion that the submission was not admitted into evidence. Tr.1 at 115; Debtor's Reply at 9,11,12,16,18. The Court took the matter of the Reconciliation's admissibility under consideration (Tr.1 at 115) and now admits the document into evidence because - contrary to the Debtor's contention - it is relevant. See e.g. English v. Greyhound Bus Lines, Inc., 826 F.Supp. 2d 728, 730 (E.D. Pa. 2011) ("The Federal Rules of evidence define 'relevant evidence' broadly") (quoting Fed. R. Evid. 401); Vitalis v. Sun Constructors, Inc., 481 Fed. Appx. 718, 724 (3d Cir. 2012) (not precedential) ("[u]nless otherwise barred, relevant evidence is admissible, and relevant evidence is any evidence that tends to make a consequential fact more or less probable.") (citing Fed.Rules 401, 402, and 403).

The Reconciliation makes the facts of the Debtor's deposits to, withdrawals from, and intricate financial connections with Amrock more or less probable. The Reconciliation is thus a relevant piece of evidence. The Debtor's counsel made no other objection to the document's submission; therefore, the Reconciliation is admitted and will be considered.

[13] Plaintiff's Exhibit 25, a "Commingling Report," which sought to show that the Debtor was using the Companies' money for personal gain, was deemed "unreliable" by the Court and was *not* admitted into evidence at the trial. Tr. 1 at 125. The Commingling Report was prepared by Plepis as an interpretation of the Reconciliation (see Tr.1 at 67); counsel for the Plaintiff admitted that the Commingling Report is "not necessary if the Court looks carefully" at the Reconciliation. Tr.1 at 122.

While the purpose of the Commingling Report is -not surprisingly - to show commingling of the Debtor's and the Companies' assets (Tr.1 at 123), the Report is not a reliable piece of evidence for at least three reasons. First, Plepis is not an expert in interpreting the numbers or documents at issue. Tr.1 at 78. Second, The Plaintiff has no personal knowledge of the events or facts at issue. See e.g. Tr.1 at 81, 86. Third, the conclusions reached in the Commingling Report are based on assumptions made by Plepis rather than on independent knowledge or documentation. See e.g. Tr.1 at 81, 86, 94, 97, 102, 112, 105. Although providing summaries to the Court is allowed under certain circumstances, see Fed. R. Evid. 1006, the Court has broad discretion to make decisions in this context. U.S. v. Bansal, 663 F.3d 634, 668 (3d Cir. 2011). Here, the Court chooses to draw its own conclusions from the Reconciliation rather than rely on the Plaintiff's interpretation.

For these reasons, Exhibit P-25 will not be considered.

33. The Benefit Sum was characterized by the Debtor as loans. Tr. 1 at 51.

33. A portion of the Benefit Sum was made up of payments to third party individuals. See, e.g. March 27, 2001 payment to Tentmakers in the amount of $500; March 30, 2001 payment to Ron Miniger in the amount of $1,225. Reconciliation at 4; Tr.1 at 35-36.

34. On or about July 14, 2006, Horrocks paid Felty, a creditor of Amrock, $200,000, thus reducing by $200,000 the obligation of the Debtor to Amrock. Ex. D-14; Tr.1 at 244-247.

35. Starting on September 4, 2001, the Debtor made a series of 14 payments, which totaled $361,533.44 (the "Pay Back Sum"), to Amrock in repayment of the Loans. See Reconciliation at 6,44,51,52,53,54,58.

36. Given the Pay Back Sum, the balance of the Loans made to the Debtor as of January 15, 2009, was approximately $817,476.17. Reconciliation at 61.[14]

37. According to Amrock's balance sheet, the total owed by the Debtor in shareholder loans was: $920,007 on December 31, 2002, and $720,889 on December 31, 2003 (Ex. D-14); $828,372 on December 20, 2004, $828,372 on December 31, 2005; and $30,815 on December 31, 2006. Tr.1 at 191, 194; Exs. D-12, D-14.

38. The $30,815 balance figure in 2006 represents the "winding down" of Amrock and the decision that the Loans to the Debtor are not collectible. Tr.1 at 202.  In other words, the $30,815 is a forgiven sum to Horrocks and represents taxable income to him. Id.

39. Loans made payable to the Debtor were deposited directly into his joint checking account. Tr.1 at 43.

40. The loans made to the Debtor from Amrock were not individually documented. Tr.1 at 53-54.

---

[14] Horrocks payment to Felty is not taken into account in the Reconciliation.

41. The loans made from the Companies to shareholders equaled less than five percent of the total money spent by the Companies. Tr.1 at 226-227; Ex. D-51.

42. Horrocks testified that he received the Loans in lieu of salary because a loan was an asset to the business (unlike a salary). Tr.1 at 58. The Debtor was obligated to "repay the entire sum [of the loans] back to the entity." Tr.1 at 252.

**Payments from Amrock to Fund the Debtor's Home Improvements**

43. From November 30, 2001 through August 30, 2002, Amrock made a total of 12 payments to fund improvements on the Debtor's personal residence. Reconciliation at 7-11; Tr.1 at 25-30, 61.

44. The total amount of these payments was $193,472.72. Reconciliation at 7-11.

45. On September 30, 2003, Horrocks made a payment of $200,000 which was credited to repay the amounts that Amrock lent the Debtor for his home improvements. Reconciliation at 19; Tr.1 at 61-62.

46. The amount listed on the Reconciliation report under the "House" category[15] was thus a positive $6,527.28 as of January 15, 2009. Reconciliation at 61.

**Amrock's Partnership Income and Loan Forgiveness**

47. Amrock's 2007 Partnership Income tax return states, *inter alia*, that a debt of $2,098,157 has been forgiven (the "Loan Forgiveness"). Tr.1 at 174, 205; Ex.J-22. The forgiven debt was owed to Amrock's lenders, including Plepis. Tr.1 at 176-177.

48. The Loan Forgiveness was reported as taxable income on both Amrock's tax return

---

[15] This separate column represented any cash flow related to the Debtor's home. Tr.1 at 19.

and on the tax returns of the owners of Amrock, according to Good, Amrock's accountant. Tr.1 at 206; Ex. J-22.

49. The amount of Loan Forgiveness included approximately $380,000 owed by Amrock to Plepis. See Ex. D-12 at 5; Tr.1 at 177.

50. Despite the Loan Forgiveness, the Debtor has no knowledge of any document by which the Plaintiff formally forgave the Loans owed to the Amrock. Tr.1 at 177. The decision to cancel the Loans was made by the Debtor as an officer of Diversified. Tr.1 at 178.

**The Debtor's Tax Returns and Personal Income**

51. The Debtor did not take a salary from the Companies from 2001 through 2004. Tr.1 at 55.

52. The Debtor did not report any taxable income in 2002. Ex.J-11; Tr.1 at 39.

53. The Debtor did not report any taxable income in 2003. Ex. J-12; Tr.1 at 40.

54. The Debtor did not report any taxable income in 2004. Ex. J-13; Tr.1 at 41.

55. Horrocks reported $16,500 in combined income with his wife in 2005. None of the loans from Amrock were listed as income on this tax return. Ex. J-17; Tr.1 at 41. At least a portion of the $16,500 was paid by Diversified. See pay stubs attached to Ex. J-17; Tr.1 at 56.

56. The Debtor reported $71,999 in combined taxable income with his wife in 2006. None of the loans from Amrock were listed as income on the tax return. Ex. P-18; Tr.1 at 42. At least a portion of this income was paid by Diversified. See W-2 statements for Kimberly and Geoffrey Horrocks attached to Ex. P-18.

57. The Debtor reported $644,195 in combined income with his wife in 2007. Ex. D-49, line 22. None of the loans from Amrock were listed as income on this tax return. Ex. P-21 Tr.1 at

42, 224.[16] At least a portion of this salary was paid by Diversified. <u>See</u> pay stubs attached to Ex.
P-21.

58. Good testified that Horrocks and his wife were each required by the IRS in 2007 to
recognize $776,000 of the Loan Forgiveness to Amrock as taxable income. Tr.1 at 231-233.

59. During the Relevant Time Period, the Debtor had income from management fees and
from selling his real estate brokerage company. Tr.1 at 44, 55. The Debtor earned a $250,000
management fee for his position at Diversified. Tr.1 at 201. This fee was not paid to the Debtor
but was used to offset the Loans Horrocks owed to Amrock. <u>Id</u>.

60. The Debtor's personal income was deposited into his joint checking account. Tr.1 at
43-44.

61. Neither Horrocks nor his accountant received any inquires about his taxes from the
IRS. Tr.1 at 171, 227.

62. Good testified that loan proceeds are not considered income by the IRS. Tr.1 at
241,243. He further testified that these loans may well have been a benefit to the Companies
because the loan was paid back and "more money was available to be disbursed to the remaining
investors." Tr.1 at 243.

**<u>Diversified's Balance Sheet</u>**

63. Diversified made a payment to the Debtor on or about November 26, 2007, in the
amount of $50,364.91 in repayment of a loan. Tr.1 at 210; Ex. D-19. (The date was incorrectly
stated as July 26, 2007 at the hearing.)

---

[16] The Debtor's accountant, Good, testified that loans from the Companies are not considered wages or
salaries by the Internal Revenue Code and, therefore, would not appear as such on the Debtor's tax returns. Tr.1 at
219.

**The Debtor's Bank Account**

64. Evidence was provided that the following deposits were made into the Debtor's

personal bank account. The source of these payments is unclear, although the Debtor testified

that some of the payments may have come from loan proceeds. Tr.1 at 45-50.

| Date | Amount of Deposit | Reference |
|------|-------------------|-----------|
| January 22, 2001 | $20,286 | Ex. J-1 |
| October 25, 2001 | $12,260 | Ex. J-1 |
| November 5, 2001 | $41,169 | Ex. J-1 |
| November 26, 2001 | $30,099[17] | Ex. J-1 |

65. Horrocks had a money market account and home equity line of credit which were

linked to and made deposits directly into his bank account. Tr.1 at 59-60.

**Payments to Amrock's Shareholder Loan Account**

66. The following transactions were made in or out of Amrock's bank account:

| Date | Entry and Amount | Explanation | Exhibit/ Reference |
|------|------------------|-------------|--------------------|
| Sep. 30, 2003 | $200,000 deposit | Debtor deposit to pay down shareholder loans | D-14;[18] Tr.1 at 148 |
| Jul. 14, 2006 | "general journal" $200,000 (minus) | Debtor paid Felty, a creditor of Amrock. Therefore, Debtor's loan from Amrock was reduced. | D-14; Tr.1 at 148-149, 202, 235 |

---

[17] This amount was erroneously cited as $40,099.94 at the trial. Tr.1 at 49.

[18] Exhibit D-14 is a report regarding shareholder loans that was generated from Amrock's balance sheets using QuickBooks softwear. Tr.1 at 145-147. The Court overrules the Plaintiff's objection that no foundation has been laid for this exhibit (Tr.1 at 146-147) because, in testifying about D-14, the Debtor discussed his own knowledge and experience. See Tr.1 at 145-153.

-14-

| Jul. 14, 2006 | "Rittenhouse $250,000" | Rittenhouse was a lender to Amrock. Rittenhouse's loan to Amrock was satisfied by Horrocks through a separate (unspecified) company that Horrocks owned. | D-14; Tr.1 at 149, 202, 235 |
|---|---|---|---|
| Jul. 14, 2006 | "Rittenhouse $75,000" | Rittenhouse was a lender of Amrock whose loan was satisfied; this was used to offset shareholder loans. | D-14; Tr.1 at 150 |
| Dec. 31, 2006 | minus $250,000 | Reduction of loan balance to Debtor upon winding down of company due to management fees owed | D-14; Tr.1 at 150 |
| Dec. 31, 2007 | $30,815 | Assigning the shareholder loans | D-14; Tr.1 at 150-151 |

## Relationship of the Plaintiff and the Defendant

67. Plepis and Horrocks met around the year 2000. Tr.1 at 65; SAC at 4; Answer at 3, 20.

68. The Plaintiff and Defendant met through their church, the Cavalry Baptist Church (the "Church"). Answer at 3, 20; Counterclaim Answer at 2.

69. In the summer of 2001, the parties were involved in Bible studies together. Answer at 20; Counterclaim Answer at 2.

## Plepis' Role at the Companies

70. Plepis is a health insurance agent in Texas. Tr.1 at 65, 77.

71. Beginning in 2005, Plepis served as the Operations Manager of Diversified. Tr. 1 at 65, 109; SAC at 4; Answer at 4.

72. Plepis served as Operation Manager at Diversified from 2005 through about half of 2006.[19] Tr.1 at 111.

---

[19] Plepis contends that he served in this position from August 2005 to August 2006; Horrocks denies that
(continued...)

73. In his role as Operations Manager, Plepis had access to the company records and was responsible for "review[ing] some documents." Tr.1 at 109; Counterclaim Answer at ¶136 (quote in Counterclaim).

74. After Plepis suffered a car accident in May 2006, he was advised that Diversified's business was not doing well and did not return to work at the company. Answer at 22; Counterclaim Answer at 3.

75. Following a dispute between the parties, the Church was involved in facilitating mediation. Answer at 24; Counterclaim Answer at 3.

**Plepis' Loans to the Companies**

76. Plepis lent money to both Amrock and Diversified. SAC at 4; Answer at 5.

77. The loans (the "Plepis Loans") which Plepis made to the Companies may be summarized as follows:

| Date of loan | Company | Initial Amount | Interest rate | Due Date |
|---|---|---|---|---|
| 5/5/05 | Diversified | $125,000 | 20% | July 5, 2005 |
| 5/12/03 | Amrock | $40,000 | 20% | August 12, 2003 |
| 9/19/02 | Amrock | $150,000 | 20% | December 1, 2004 |
| 8/1/02 | Amrock | $95,000 | 20% | December 15, 2003 |
| 10/23/01 | Amrock | $95,000 | 30% | Oct. 23, 2002 |

See SAC, Exs. B-J; Answer at 21; Counterclaim Answer at 2.[20]

---

[19](...continued)
this time frame is correct but does not offer a different one. SAC at 4; Answer at 4.

[20] This chart does not include documentation of loan refinancing. There may have been additional loans

(continued...)

78. The Plepis Loans were paid back in part but not in full. Tr.1 at 76.

# IV.  DISCUSSION

## A. Nevada Law Applies to This Proceeding

As discussed, the preliminary issue to be addressed by this Opinion (and the only issue in this matter because the Plaintiff does not prevail) is whether Plepis can successfully pierce the corporate veil of Amrock and reach the assets of the Debtor.[21] When faced with such an analysis, courts in the Third Circuit and elsewhere look to the state of incorporation of the company at issue. See IBC Mfg Co. v. Velsicol Chemical Corp., 1999 WL 486615, at *3 (6th Cir. Jul. 1, 1999) ("Because it is Chemwood's corporate veil that would be pierced, and Chemwood was incorporated in Tennessee, we apply Tennessee law."); Stromberg Metal Works, Inc. v. Press Mech., Inc., 77 F.3d 928, 933 (7th Cir. 1996) ("Efforts to 'pierce the corporate veil' are governed by the law of the state of incorporation.") (citation omitted);  Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d. Cir. 1995) ("the law of the sate of incorporation determines when the corporate form will be disregarded . . .  Because Atex was a Delaware corporation, Delaware law determines whether the corporate veil can be pierced in this instance.") (internal quotes and citations omitted); In re Tutu Wells Contamination Litig., 909 F.Supp. 1005, 1009 (D.V.I. 1995) ("in order to determine whether to pierce the corporate veil of a particular corporation, the court must apply the law of the sate of incorporation of that corporation.") (citing Restatement (Second) of

---

[20](...continued)
from the Plaintiff to the Companies which were not documented. See SAC at 18.

[21] Again, the Plaintiff only seeks to pierce the corporate veil with regard to Amrock. Tr.1 at 212.

Conflicts §307; <u>Realco Services Inc. v. Holt</u>, 513 F. Supp. 435, 422 n.8 (E.D. Pa. 1980), *aff'd*, 671

F.2d 495 (3d Cir. 1981)) (additional citations omitted); 2 Fletcher Cyc. Corp. §41.90 (2015)

("Although the choice of which state's law to apply in a diversity case is determined by the law of

the forum state . . . the state of incorporation has the greater interest in determining when and if

the corporate veil should be pierced.").

Amrock was a Nevada corporation. Tr.1 at 139; Exs. D-1 through D-5.[22] Therefore, the

Court will apply laws applicable in the state of Nevada in its veil piercing analysis.

**B.  Legal Standard with Regard to Piercing the Corporate Veil**

In Nevada, alter-ego claims are governed by statute, which provides that a stockholder of a

corporation is not liable for its debts unless the following elements have been met:

(1) The corporation is influenced and governed by the stockholder, director, or officer;

(2) There is such unity of interest and ownership that the corporation and the stockholder,

director or officer are inseparable from each other; and

(3) Adherence to the corporate fiction of a separate entity would sanction fraud or promote

a manifest injustice.

N.R.S. 78.747(2).[23] Each of these requirements must be met "before the alter ego doctrine can be

applied." <u>N. Arlington Med. Bldg., Inc. v. Sanchez Constr. Co.</u>, 86 Nev. 515, 520-21 (Nev. 1970).

These elements must be established by a preponderance of the evidence. <u>JSA, LLC  v. Golden</u>

<u>Gaming, Inc.</u>, 2013 WL 5437333, at *5 (Nev. Sept. 25, 2013).

---

[22]  For example, Amrock filed a Certificate of Limited Partnership in Nevada on May 12, 2000. Ex. D-1.
Also, the Agreement of Limited Partnership states, *inter alia*, that "[t]he General Partners shall promptly take any
and all action that may be necessary and appropriate to perfect and maintain the Partnership as a limited partnership
under the laws of the state of **NEVADA** . . . ." Ex. D-3 at 17 (emphasis in original).

[23]  This statute has been applied to LLCs as well as corporations. <u>See</u> <u>Volvo Constr. Equip. Rents, Inc. v.</u>
<u>NRL Rentals, LLC</u>, 614 Fed. Appx. 876, 878 n.1 (9th Cir. 2015) (<u>citing</u> <u>Webb v. Shull</u>, 270 P.3d 1266, 1271 n.3
(Nev. 2012)); <u>see also</u> <u>In re Giampietro</u>, 317 B.R. 841 (Bankr. D. Nev. 2004).

While courts do employ the above three-part test in determining whether to pierce the corporate veil, "there is no litmus test" and "the result depends on the circumstances of each case." Wilson Logistics Nevada, Inc. v. Lincoln Gen. Ins. Co., 2011 WL 5080176, at *2 (D. Nev. Oct. 26, 2011) (quoting Polaris Indus. Corp. v. Kaplan, 747 P.2d 884, 887 (Nev. 1987)). The "essence" of the alter-ego doctrine is to "do justice when it appears that the protections provided by the corporate form are being abused." LFC Mktg. Group, Inc., v. Loomis, 116 Nev. 896, 903 (2000) (quoting Polaris). But it should be remembered that "the corporate cloak is not lightly thrown aside." In re Giampietro, 317 B.R. 841, 851 (Bankr. D. Nev. 2004) (citing Baer v. Amos J. Walker, Inc., 85 Nev. 219, 220, 452 P.2d 916,916 (Nev. 1969)).

## C.  Applying the Law to the Facts: Analysis with Regard to the Three-Part Test for Alter-Ego Claims

### 1. Is the Corporation Influenced and Governed by the Stockholder, Director or Officer?

Plepis presented no evidence that Horrocks influenced and governed Amrock. Nevada courts look to exclusive governance of a company as proof that a shareholder held improper influence. See e.g., In re Gampietro, 317 B.R. at 851; Lorenz v. Beltio, Ltd., 114 Nev. 795, 808 (Nev. 1988). However, in this proceeding, the Plaintiff went out of his way to argue the opposite. Plepis stated in his Brief that it was a "fiction" that Horrocks was an "officer of Amrock; he was merely a limited partner of Amrock. The Limited Partnership Agreement . . . *precluded* Horrocks from participating in the operation and management of Amrock except to the extent when acting as the officer of the general partner." Plaintiff's Post-Trial Brief at 18-19 (emphasis in original, internal citation omitted). See also Plaintiff's Post-Trial Brief at 4 ("Horrocks had no role in Amrock except as a limited partner and as the President of Diversified. *He was not an officer of Amrock.*") (emphasis in original).

-19-

Plepis is correct on this point; the Debtor is merely a limited partner of Amrock. Evidence

was not offered at the trial that Horrocks was the owner or sole shareholder of Amrock, much less

the exclusive officer in control of governing the company; far from presenting such proof, the

Plaintiff does not even make such an assertion. Thus, there is no reason to believe as a matter of

law that the Debtor influenced and controlled Amrock.[24]

### 2. Is There Such a Unity of Interest and Ownership that the Corporation and the Stockholder are Inseparable from Each Other?

Nor has Plepis offered sufficient evidence with regard to element two of the Nevada

statutory test. Courts consider the following factors with regard to this prong: 1) commingling of

funds; 2) undercapitalization; 3) unauthorized diversion of funds; 4) treatment of corporate assets

as the individual's own; and 5) failure to observe corporate formalities. See JSA, LLC v. Golden

Gaming, Inc., 2013 WL 5437333, at *5 (Nev. Sep. 25, 2013). These factors are indicative of an

alter-ego relationship, "but no one factor is determinative." Brown v. Kinross Gold U.S.A., Inc.,

531 F. Supp.2d 1234, 1242 (D. Nev. 2008).

Plepis did not argue or offer evidence that Amrock failed to observe corporate formalities.

On the other hand, the Debtor provided numerous exhibits to demonstrate Amrock's corporate

form, including a Certificate of Limited Partnership, Annual List of General Partners and Resident

Agent, Amrock's Agreement of Limited Partnership, its Certificate of Agent for Service of

Process, and balance sheets See Exhibits D-1, D-2, D-3, D-4, and D-12.

Plepis also failed to offer evidence with regard to the allegation of Amrock's

undercapitalization. Rather, the Plaintiff's Post-Trial Brief meekly argues- via a one paragraph

---

[24] The Debtor sometimes held a governing role at Diversified, which was the general partner of Amrock. See e.g. D-1 and D-11. These facts, however, are too tenuous to conclude that Horrocks influenced and governed Amrock (even if Plepis had argued such).

analysis pointing to the Debtor's own exhibits - that Amrock lacked sufficient funds. See
Plaintiff's Post Trial Brief at 22-23. While the primary exhibit to which the Plaintiff points (D-12)
does show that Amrock's liabilities were greater than its assets for years, this demonstrates that
the company may have been insolvent for a period, not that it was undercapitalized. Critically,
"[t]he adequacy of capital is to be measured as of the time of formation of a corporation. A
corporation that was adequately capitalized when formed but subsequently suffers financial
reverses is not undercapitalized." 1 Fletcher Cyc. Corp. §41.33; see also Trustees of the Nat'l
Elevator Indus. Pension, Health Benefit and Educ. Funds v. Lutuk, 332 F.3d 188, 196 (3d. Cir.
2003) ("mere insolvency is distinct from undercapitalization") (citing Fletcher). While the
Plaintiff does assert in his Post-Trial Brief that Amrock was never "adequately capitalized," he did
not present evidence of Amrock's financial status or lack of capital *at the time of the formation* of
the company (in 1999) and, therefore, the Court makes no such conclusion with regard to this
factor. Plaintiff's Post-Trial Brief at 22.[25]

    Further, even if Amrock were undercapitalized (which this Court has not found), this is
insufficient grounds to pierce the corporate veil. See Paul Steelman, Ltd. v. Omni Realty Partners,
110 Nev. 1223, 1225 (1994); In re Branding Iron Steak House, 536 F.2d 299, 302 (9th Cir. 1976).
See also North Arlington Medic. Bldg, Inc. v. Sanchez Constr., 471 P.2d 240, 244 (Nev. 1970)
("in the absence of fraud or injustice of the aggrieved party, [undercapitalization] is not an
absolute ground for disregarding a corporate entity.").

    Plepis' argument with regard to the remaining factors of this prong - commingling,
diversion of funds and treatment of assets as one's own - boil down to the Plaintiff's assertion and

---

[25] The additional Exhibits to which the Plaintiff points, D-15 and D-16, are Amrock's 2002 and 2003 tax
returns and do not show evidence of undercapitalization at the time of the formation of the company.

evidence presented with regard to the Loans to the Debtor.[26] While it is true that the Loans were for a considerable sum, in the final analysis the Plaintiff failed to prove that the lending signified an improper and illegal unity of interest between Horrocks and Amrock. This was his burden. See e.g., North Arlington Medic. Bldg., 471 P.2d at 244 (noting that burden was on the Plaintiff to demonstrate that the alleged alter-ego's use of corporate funds was not legitimate); Brown, 531 F.Supp. 2d at 1242 ("The second element of the alter ego test requires a plaintiff to demonstrate the entities are inseparable from one another . . . "); Nevada Contractors Ins. Co. v. Kukurin, 2011 WL 3298513, at *2 (Nev. July 29, 2011) (finding no unity of interest in an alter-ego analysis and stating, "[Plaintiffs] failed to demonstrate that [the Defendant] treated the money as his own, and there is nothing in the record that suggests [Defendant] treated [the] money as his own . . . "); JSA LLC , 2013 WL 5437333 at *5 ("courts have generally declined to find alter ego liability based on a parent corporation's use of a cash management system.") (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1459 (2d Cir. 1995)) (additional citations omitted).

        The only facts relevant to this analysis proved at trial were that Horrocks received approximately $1,179,009 in loans from Amrock over an eight year period (from 2000 to 2008), of which he paid back about $361,533 (about one third). These Loans were provided to the Debtor in lieu of salary.[27] The fact that Horrocks paid back a significant portion of the Loans suggests that rather than an unauthorized diversion of assets or an illegal treatment of corporate assets as his own, the Debtor viewed the loans as just that - money which he was expected to return. Further,

---

        [26] The improvements to the Debtor's home which were funded by Amrock were all paid back by the Debtor and may thus be considered additional loans. See Finding of Facts Nos. 43-46.

        [27] Amrock reduced the Debtor's loans by $250,000 at the end 0f 2006 due to a management fee that was owed. Tr.1 at 150; Ex.D-14.

the Plaintiff provides no evidence that the funds of the Debtor and Amrock have been

commingled or that Horrocks assumed that the money lent to him was his or that he treated it as

such. In addition, when one considers both that Horrocks worked long hours (around 60 per week)

for the Companies and that he received no salary, the benefit of $817,476 in Loans (which equates

to about $102,000 a year) does not strike the Court as shocking or illegal.

That the Loans to the Debtor were documented by Amrock also suggests that commingling

of assets did not occur. See Exs. D-12 and D-14. Although "*undocumented* loans could potentially

serve as the basis for piercing the corporate veil, the fact that [the company] memorialized the

transfers in it [sic] records undercuts an alter ego theory." Wen v. Willis, 2015 WL 6379536, at *6

(E.D. Pa. Oct. 22, 2015) (emphasis in original) (citing In re Blatstein, 226 B.R. 140 (E.D. 1998),

*aff'd in part, rev'd in part*, 192 F.3d 88 (3d Cir. 1999)) (additional citations omitted); see also Mk

Investments v. First Options of Chicago, Inc., 19 F.3d 1503, 1522 (3d Cir. 1994) ("Alter ego

status cannot be inferred whenever a shareholder withdraws some monies from a corporation

without formally declaring a dividend or executing a note even if one of the withdrawals is made

while the corporation is insolvent. If it did, every payment to a stockholder during insolvency

would justify piercing the corporate veil."). Amrock made an effort to separate and keep track of

the Loans; this is not the action of a company whose interests were inseparable from those of the

employee to whom it lent money.

Plepis complains that the Loans to the Debtor violated IRS requirements, were a "scheme"

to avoid taxable income, that no interest was ever paid by Horrocks, and that the "whole concept

of 'loans to officers' is questionable under the Amrock Limited Partnership Agreement . . . ."

Plaintiff's Post-Trial Brief at 16-17 (quotes at 16 and 17, respectively). However, the Plaintiff

fails both to analyze how such alleged mis-steps actually amounted to a commingling, a diversion

of funds,[28] or a treatment of Amrock's assets as Horrocks'. Nor does Plepis cite any legal

authority to support his contentions. While Horrocks may not be a perfect citizen, Plepis (who

bears the burden of proof) has not offered sufficient evidence to meet part two of the high bar to

pierce the corporate veil. Thus, there is insufficient reason to determine a unity of interest between

Amrock and the Debtor.

### 3. Has Adherence to the Corporate Fiction of a Separate Entity Sanctioned Fraud or Promoted a Manifest Injustice?

Lastly, Plepis has not shown that Horrocks' actions have sanctioned fraud or promoted a

manifest injustice- the third and necessary prong of the test for piercing the corporate veil in

Nevada. In cases finding this prong satisfied, there is usually "evidence proving the controlling

entity somehow used the alter-ego company to commit tortuous conduct, hide assets, or prevent

debtors from collecting their debts." DFR Apparel Co., Inc. v. Triple Seven Promotional Products,

Inc., 2014 WL 4828874, at *3 (D. Nev.  Sep. 30, 2014). There is no such evidence here.

While it is not required for a plaintiff in an alter-ego action to prove "actual fraud," it must

be shown that failing to pierce the corporate veil "would result in an injustice." Giampietro, 317

B.R. at 849 (citations omitted).

The only "injustice" that the Plaintiff complains of is that Amrock's creditors did not get

paid. See e.g. Transcript of closing argument, doc. no. 84, at 6, 9,10. However, "[s]imply not

being paid . . . is not, in and of itself, sufficient injustice" to warrant the piercing of the corporate

veil. Giampetro, 317 B.R. at 853. See also Golden Gaming, Inc., 2013 WL 5437333, at *6

---

[28] The Plaintiff is bothered, for example, by Horrocks' payment of Amrock's debts to others (Felty and Rittenhouse) and subsequent reduction of his loan from Amrock. See Tr.1 at 149; D-14; Plaintiff's Post-Trial Brief at 11, 20 (spelling the name "Feldi"). However, if anything, this transaction shows that the accounts of the Debtor and Amrock were kept separate rather than commingled.

(finding it "unfortunate" but not unjust that the Plaintiffs would not receive payment and further

noting that "appellants and their agents, and not [the company at issue] are responsible for not

protecting against the eventuality that occurred. . .") (internal quotation omitted); North Arlington

Medic. Bldg., 471 P.2d at 245 (finding that an unprofitable venture did not "sanction a fraud or

promote injustice"); but see Polaris Indus. Corp. v. Kaplan, 103 Nev. 598, 603 (1987) (piercing

the corporate veil upon a finding that officers made "ad hoc withdrawals . . .  in the form of

advances to themselves at a time when the corporation's debt [to a creditor] was not being paid,

and that [the creditor] was damaged because these actions left the corporation without funds to

repay the debt.").

　　　　The Giampetro court analyzed the third prong of the Nevada test in terms of reasonable

reliance, concluding that the creditor "did not rely upon, even care about, the lack of formality . . .

[the creditor] received exactly what it bargained for . . . and thus the denial of recourse to [the

Plaintiff] is not unjust." Giampetro, 317 B.R. at 857-8. See also In re Nat'l Audit Def. Network,

367 B.R. 207, 229 (D. Nev. 2007) (citing Giampetro); JSA, LLC , 2013 WL 5437333, at *6 (Nev.

Sept. 25, 2013) (finding no reliance where no representation made).  Similarly here, there is no

evidence that Plepis relied on or even assumed that Horrocks was an integral part of Amrock at

the time he lent money to the company. The fact that the Plaintiff insists that the Debtor was not

an officer of Amrock suggests that he dealt with the company as a separate entity. Thus, there is

no reason, based on the evidence presented, to conclude that piercing the corporate veil is

necessary to prevent or rectify an injustice.

　　　　For all these reasons, the Court concludes that the Plaintiff fails to meet the three part

Nevada test and, therefore, the corporate veil of Amrock will not be pierced.

## V. THE COUNTERCLAIM

Because the Court holds that there is insufficient evidence to pierce the corporate veil, the

remainder of the Adversary Proceeding is moot (the debts at issue not being owed to the Debtor).

Further, the Defendant's Counterclaim will be dismissed. As discussed above, the Counterclaim

seeks a declaratory judgment that Counts I through XII of the State Law Action be "discharged."

The State Law Action primarily charges state law causes of action (see footnote 4), does not name

the Debtor as the only Plaintiff, and has not been shown to pose a significant impact on the

bankruptcy estate. For these reasons, the Court will exercise its discretion not to adjudicate the

Counterclaim. See e.g. Borough of W. Mifflin v.Lancaster, 45 F.3d 780,788 (3d Cir. 1995)

("where the claim over which the district court has original jurisdiction is dismissed . . .  the

district court must decline to decide the pendent state claims unless consideration of judicial

economy, convenience, and fairness to the parties provide an affirmative justification for doing

so") (citations omitted); Sanchez v. Hoosac Bank, 2014 WL 1326031, at *8 (S.D.N.Y. Mar. 31,

2014) (court declining to exercise jurisdiction over state law counterclaims); Citimortgage, Inc. v.

Gakoumis, 2013 WL 7120181, at *1 (E.D. Pa. June 17, 2015) (declining to exercise supplemental

jurisdiction over counterclaims once original claims dismissed); Amethyst Int'l ,Inc., 2014 WL

683670, at *10 (D.N.J. Feb. 20, 2014) (same).[29]

Also, adjudication of the Counterclaim calls for an advisory opinion. The Counterclaim

seeks a declaratory judgment that the State Law Action be "discharged," notwithstanding the facts

that Debtor was granted a discharge by this Court on June 11, 2015 (doc. no. 33 in the main case),

---

[29] The Counterclaim will be dismissed rather than remanded because, while the Counterclaim concerns the
State Law Action, it was not actually filed in or removed from state court. Remand to state court is only appropriate
for actions that were removed from state court. See e.g. Orthopedic "Bone Screw" Prod. Liab. Litig. v. Eyster,
M.D., 132 F.3d 152, 155 (3d Cir. 1997); Mawhinney v. Bennett, 2010 WL 4860358, at *2 (D.N.J. Nov. 22, 2010).

that the State Law Action was stayed by the filing of the Debtor's bankruptcy, and that the underlying action presents no bankruptcy law question. Doc. no. 35 at 25-27. Under such circumstances, in which a determination would have "no legal effect" and "conclusiveness of judicial judgment and any utility of that judgment are totally lacking," courts are precluded from making advisory opinions. Coffin v. Malvern Fed. Sav. Bank, 90 F.3d 851, 854 (3d Cir. 1996). See also In re Bradlees Stores, Inc., 311 B.R. 29 (S.D.N.Y. 2004); In re Ciccimaro, 364 B.R. 184 (E.D. Pa. 2007). That the Debtor's Counterclaim asks for a declaratory judgment and seeks a discharge in response to state law causes of action (and a RICO claim) is a further indication that consideration would constitute an advisory opinion. See Westport Ins. Corp. v. Bayer, 284 F.3d 489, 499 (3d Cir. 2002) ("the judgment in a suit for declaratory judgment must be responsive to the pleadings and issues presented . . . A judgment beyond the issues presented constitutes an advisory opinion."). For the additional reason that the Debtor seeks an advisory opinion, the Counterclaim will be dismissed.

## VI. CONCLUSION

For all the reasons discussed, the Court determines that the Plaintiff has failed to meet his burden of proof with regard to piercing the corporate veil. As a result, this cause of action fails and the Debtor is not liable for the debts which the Plaintiff seeks to recover. Consequently, the remaining counts of the Adversary Proceeding (seeking nondischargeability of those debts) are moot. Accordingly, judgment for the Debtor/Defendant will be entered with regard to the Adversary Complaint,  An appropriate order will follow.

Date: April 4, 2016.

_____
JEAN K. FITZSIMON
United States Bankruptcy Judge